UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES,<br><br>v.<br><br>RICHARD GREATSINGER. | No. 3:23-cr-62-10 (OAW) |

**ORDER DENYING MOTION TO SUPPRESS**

Defendant Richard Greatsinger was indicted for Conspiracy to Possess with Intent to Distribute Controlled Substances and Possession with Intent to Distribute Cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), ECF No. 21.  On December 1, 2023, at ECF No. 305, Mr. Greatsinger moved to suppress evidence which he argues was the fruit of an unlawful search of his vehicle.  That search was during a motor vehicle stop shortly after midnight on October 16, 2022, ECF No. 1 at 37–39, pursuant to a police K9 alert to the suspected presence of narcotics therein.  Police discovered and seized cocaine hydrochloride from within the vehicle.  *Id.*  The government responded to the motion on December 22, 2023, and Mr. Greatsinger replied on February 1, 2024.  ECF Nos. 335, 396.  A suppression hearing took place on October 17, 2024, to determine: (1) who ordered the motor vehicle stop, and (2) upon what basis. ECF No. 797.  Thereafter, the court permitted supplemental briefing.  For the reasons explained below, and having considered all the above, the motion to suppress hereby is **DENIED**.

1

**BACKGROUND**

From January 2022 to February 2023, the Drug Enforcement Administration (DEA) and Federal Bureau of Investigation (FBI) conducted a joint investigation which involved court-approved wiretaps and search warrants, and physical and electronic surveillance.

Mr. Greatsinger's motion relates to the circumstances of his October 16, 2022, arrest. On October 15, 2022, investigators intercepted communications through which he and codefendant Aquarius Gumbs (a target of the FBI / DEA investigation) planned a meeting to distribute a controlled substance.[1] *See* Compl., ECF No. 101 ¶¶ 81-84. Later that evening, investigators surveilling Mr. Gumbs's residence observed Mr. Greatsinger arrive in his black Ford Explorer, enter the home, and depart roughly an hour later (shortly after midnight on October 16, 2022). *Id.* Based on their observations, members of the surveillance team followed Mr. Greatsinger's vehicle and asked the West Haven Police Department's Street Crime Unit (WHSCU) to initiate a "walled-off stop."[2] *Id.*

Officer Joseph Riehl of the WHSCU responded to the request by federal investigators. *Id.* The WHSCU was aware of the DEA Task Force's investigation into Mr. Gumbs's distribution of narcotics. *Id.*, ECF 335, 3-4. In fact, the Task Force Officer who requested assistance stopping Mr. Greatsinger also was a member of the WHSCU. *Id.*

---

[1] The affidavit attached to the Complaint details this communication. *See* Compl., ECF No. 101 ¶¶ 81-82. During the intercepted call, Greatsinger asked Gumbs if he could "come by real quick," and to "have some tasty drinks" ready. *Id.* The affiant states that, based on training and experience, these communications evince a narcotics transaction. The Complaint discusses how Gumbs and Greatsinger would frequently utilize references to alcoholic beverages to disguise narcotics transactions. *Id.*

[2] A "walled-off stop" occurs when a police officer lawfully stops a vehicle for a traffic violation but does so at the request of narcotics investigators who suspect that the occupants are involved in distributing drugs. By having another police officer and/or law enforcement agency perform the stop, the investigators preserve the integrity of the drug investigation and without signaling to any occupant that they are under investigation for dealing drugs. *See United States v. Gomez*, 751 Fed. Appx. 63, 65 (2d Cir. 2018).

At about 12:15 a.m., Officer Riehl stopped Mr. Greatsinger.  *Id.*  Video of the stop contains audio transmissions such as, "Joe just lit him up," "looks like he's—uhh curbing," "I'm just gonna creep see if he is reaching as I pull up to him" and "thank you fellas."  *Id.*  Thereafter, Task Force Investigators apparently departed from the scene of the stop.  *Id.*

Upon stopping Mr. Greatsinger, Officer Riehl informed him that he was stopped because his third brake light was inoperable.[3]  ECF No. 305, at 2.  The defendant handed Officer Riehl his license and registration but could not promptly locate a valid copy of his insurance card.  While Greatsinger continued looking for his insurance card, Officer Riehl returned to his cruiser and reviewed the defendant's license and registration.  During that review, K9 Officer Butler arrived and approached Greatsinger's vehicle.  Officer Riehl approached Greatsinger to return the documents and noticed that he was shaking and avoiding eye contact.  ECF Nos. 305-3 (Riehl BWC), 305-4.  He advised that K9 Officer Butler would be searching the exterior of his vehicle with his canine partner "Hanny."

Officers Butler and his canine performed a search of the exterior of Greatsinger's Ford Explorer.  Hanny alerted Officer Butler to the presence of drugs near the driver side door of the vehicle.  A subsequent search of the interior of Defendant's vehicle uncovered 26.5 grams of cocaine and fentanyl in a knotted bag.  *See* ECF No. 305-4.

It is within the court's discretion to determine whether the facts alleged in support of a suppression motion warrant a hearing.  *See United States v. Jass*, 331 F. App'x 850, 855 (2d Cir. 2009).  Many facts material to deciding this motion were not in dispute, so the court ordered a suppression hearing limited to the cause of the motor vehicle stop in question (namely, who ordered it, and why).

---

[3] Defendant was also charged with traveling unreasonably fast in violation of Conn. Gen. Stat. § 14-218a. ECF No. 305-4.

**DISCUSSION**

"The Fourth Amendment permits brief investigative stops—such as the traffic stop in this case—when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396 (2014), *United States v. Stewart*, 551 F.3d 187, 191 (2d Cir. 2015) (traffic stop does not run afoul of the Fourth Amendment when officer making the stop has reasonable suspicion that person stopped is engaged in criminal activity). Further, "[a]lthough the Fourth Amendment generally requires police to obtain a warrant before conducting a search, there is a well-established exception for vehicle searches . . . [i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." *United States v. Goolsby*, 820 Fed. Appx. 47, 49 (2d Cir. 2020) (quoting *United States v. Jones*, 893 F.3d 66, 70 (2d Cir. 2018)). Generally speaking, the investigating officer must be personally aware of "specific and articulable facts" that together with "rational inferences from those facts" provide the officer "a particularized and objective basis for suspecting legal wrongdoing" which justifies an investigative motor vehicle stop. Law enforcement may conduct a warrantless search of that vehicle if probable cause exists to believe it contains contraband. *United States v. Singletary*, 798 F.3d 55, 59 (2d Cir. 2015)

But an exception exists to the general rule. The collective knowledge doctrine provides "[a]n arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation." *United States v. Colon*,

4

250 F.3d 130, 135 (2d Cir. 2001) (citing *United States v. Hensley*, 469 U.S. 221, 230-33 (1985). That is, the collective knowledge doctrine permits an investigating officer who lacks personal knowledge of "specific and articulable facts" to conduct an investigatory stop by imputing the knowledge of other officers involved with the investigation.

In this case, DEA agents requested Officer Riehl to conduct a motor vehicle stop of the defendant without conveying the underlying factual bases for their suspicions.[4] At the suppression hearing, Task Force Officer (TFO) David Schaefer explained that he was employed by the West Haven Police Department, but that he was sworn to assist the DEA with its investigations. Specifically, he had worked on the wiretap investigation involving Mr. Gumbs.

TFO Schaefer testified that on October 10, 2022 (days before the Greatsinger stop), Officers Riehl and Butler had been "read in" and "minimized" as to the Gumbs investigation, meaning that they were briefed on it but were told not to disclose to other officers information they had learned about the investigation. Officers Riehl and Butler assisted in surveillance related to this investigation on the date of the Greatsinger stop.

During the investigation into Mr. Gumbs, Mr. Greatsinger became a target due to his frequent communications with Mr. Gumbs. Due to his communications and actions, investigators followed Mr. Greatsinger after his meeting with Mr. Gumbs because they suspected a narcotics transaction had just occurred. For that reason, and because surveillance investigators were in plainclothes within unmarked vehicles (which were not equipped with emergency lights), they radioed the West Haven Police Department

---

[4] Nothing in the government's briefing suggests any information was shared – just that Officer Riehl was a member of a task force that as aware of the DEA's investigation. At the suppression hearing, witnesses explained in greater detail the investigative plan, how it was executed, and the reasons therefor.

5

(WHPD) to request a motor vehicle stop of Mr. Greatsinger. Again, the investigators surveilling Mr. Gumbs requested the motor vehicle stop of Mr. Greatsinger because they suspected Mr. Greatsinger of having just engaged in a drug transaction, based on their observations, investigation, and surveillance.

Officer Brandon Butler of the WHPD testified that he had been minimized as to the DEA investigation into Mr. Gumbs and that he was assisting the DEA on the date of the Greatsinger stop. A plan was developed to stop Mr. Greatsinger once he crossed into West Haven; Officer Butler would be positioned nearby and would respond sometime after the stop (to maintain the integrity and secrecy of the drug investigation).

Sergeant Joseph Riehl (also of the WHPD) testified that he, too, had been minimized as to the drug investigation into Mr. Gumbs and that he assisted in surveillance related thereto. He confirmed that a plan to stop Mr. Greatsinger had been developed because investigators believed drugs would be found in Mr. Greatsinger's vehicle. Indeed, he was asked to conduct a walled-off stop Mr. Greatsinger for this reason, while he was in uniform within a marked police cruiser, though Sgt. Riehl told Mr. Greatsinger that the stop was for an equipment violation which he since learned could not be a valid reason to stop a vehicle. Nevertheless, the reasons for the stop given to Mr. Greatsinger were merely a ruse to protect the integrity of the drug investigation. The request for the stop came from the DEA, by way of the WHPD radio.

When called back to the witness stand by the defense, TFO Schaefer testified that he was the one who issued the request over the radio to stop Mr. Greatsinger's vehicle.

Due to the "complexity of modern police work," the collective knowledge doctrine acknowledges that an "arresting officer cannot always be aware of every aspect of an

investigation; sometimes his authority to arrest . . . is based on facts known only to his superiors or associates." *United States v. Valez*, 796 F.2d 24, 28 (2d Cir. 1986); *see also Hensley*, 469 U.S. 230-33.  "Reasonable suspicion can therefore be premised in whole or in part on the knowledge of the officer conveying the information, not on 'whether those relying on the information were themselves aware of the specific facts which led their colleagues to seek their assistance.'" *United States v. Hussain*, 835 F.3d 307, 316 n.8 (2d Cir. 2016) (quoting *Hensley*, 469 U.S. 231).  In other words, it permits the "police . . . to act on the strength" of work done by fellow officers.[5]  *Whiteley v. Warden Wyo. State Penitentiary*, 401 U.S. 560, 568 (1971).

To the extent the defense relies on the belief that *Hussain*[6] would require the DEA investigators in this case to have given Sgt. Riehl and Ofc. Butler a fulsome account of the investigative findings that established reasonable suspicion to believe Mr. Greatsinger was in possession of narcotics in order for the stop to have been legally valid, the court finds such a reading of *Hussain* to be overly expansive of its substance and purpose. Further, the court need not find that a mere request by investigators would have been enough to support the stop of Mr. Greatsinger by imputing their investigative knowledge without any need to explain to the officer conducting the stop that Mr. Greatsinger was

---

[5] Officers do not need to be within the same department for the government to invoke the collective knowledge doctrine.  See *United States v. McCartney*, 357 Fed. Appx. 73 (9th Cir. 2009).

[6] Other circuits describe the collective knowledge doctrine in terms of a "vertical" or "horizontal" application. See *United States v. Chavez*, 534 F.3d 1338 (10th Cir. 2008).  Vertical collective knowledge involves an officer with probable cause or reasonable suspicion instructing another officer to act.  *United States v. Balser*, 70 F.4th 613, 619-620 (1st Cir. 2023), *United States v. Latorre*, 893 F.3d 744 (10th Cir. 2018); *see also United States v. Caraballo*, No. 3:20-cr-137 (RNC), 2024 WL 1521614, at *1 (D. Conn. Apr. 9, 2024). In that instance, the acting officer is seen as the agent or party relying on information provided by the instructing officer(s).  *United States* v. *Gorham*, 317 F. Supp. 3d 459, 473 (D.D.C. 2018).  Horizontal application permits the legal standard to be met through aggregating the knowledge of multiple officials, even where no individual officer may have had sufficient information on their own.  Through this analysis, the present case (vertical application) would be distinguishable from *Hussain* (a horizontal application).

7

suspected of possessing narcotics, because in this case, then-Officers Riehl and Butler had been "minimized" as to the investigation, and were privy to some of the facts that supported the investigators' reasonable suspicion that Mr. Greatsinger possessed drugs.

As the United States Court of Appeals for the Second Circuit has held, "application of the imputed knowledge doctrine requires that at some point along the line, some law enforcement official—or perhaps some agglomeration of such officials—involved must possess sufficient information to permit the conclusion that a search is justified." *Colon*, 250 F.3d 136. The "primary focus" in collective knowledge cases is "whether the law enforcement officers initiating the search or arrest, on whose *instructions* or information the actual searching or arresting officers relied, had information that would provide reasonable suspicion or probable cause to search or arrest the suspect." *Id.* 135–36 (emphasis added). "Furthermore, under the collective knowledge doctrine, even if the law enforcement officer conducting the search lacks the relevant facts to support probable cause, the search may nonetheless be permissible if the officer acted on the assessment or instructions of other officers who did have such facts." *United States v. Babilonia*, 854 F.3d 163, 178 (2d Cir. 2017); *see also United States v. Gomez*, 199 F. Supp. 3d 728, 743 n. 13 (S.D.N.Y. 2016*), aff'd*, 751 F. App'x 63 (2d Cir. 2018).

Here, investigators had reasonable suspicion to request the motor vehicle stop of Mr. Greatsinger (and perhaps probable cause to order a search of the car straight away). The officers conducting the stop were aware of certain aspects of the drug investigation that supported such reasonable suspicion, which made the stop and canine sniff valid. Thus, the present case is easily distinguishable from *Hussain*, in which the Second Circuit found that there was "no evidence . . . that [the observing officer] communicated <u>anything</u>

to [the officer who searched the vehicle." *Hussain*, 835 F.3d 316; *see also id.* at 316 n. In the present case, the court finds that reasonable suspicion to stop Mr. Greatsinger indeed existed, *and* that it existed at the inception of the motor vehicle stop in question.

That the stop was based on reasons beyond those mere traffic violations conveyed to Mr. Greatsinger at the time of the stop renders moot the defendant's claims that the stop was unreasonably long (due to delays that allowed the canine officer to arrive). This mootness is because excessively extending a stop to await a canine sniff is **only** prohibited when that stop is due to "a police-observed traffic violation," and **nothing else.** *Rodriguez v. United States*, 575 U.S. 348, 350 (2015). Again, the stop in this case was based on drug-related suspicion, and **not** merely due to traffic violations.

The court declines to retroactively preclude admission or consideration of the hearing testimony due to the unavailability of certain recorded communications, or in the alternative, to draw an adverse inference based on its absence. This is partially because the video of the Greatsinger stop contains audio communications consistent with the testimony that the investigators into Mr. Gumbs requested the stop, including audio that captured what appears to have been a concluding word of thanks for initiating that stop.[7]

---

[7] Furthermore, the Rules of Evidence do not apply to the admission of evidence at suppression hearings. *United States v. Matlock*, 415 U.S. 164 (1974) ("[T]he rules of evidence normally applicable in criminal trials do not operate with full force at hearings before the judge to determine the admissibility of evidence."); *see also United States v. Raddatz*, 447 U.S. 667, 679 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial."), *United States v. Dipirro*, 649 Fed. Appx. 930, 933 (11th Cir 2016) ("The Federal Rules of Evidence do not apply with full force at suppression hearings."), *United States v. Bunnell*, 280 F.3d 46, 49 (1st Cir. 2002) ("The Federal Rules of Evidence, apart from testimonial privileges, do not apply at suppression hearings."), *United States v. Killebrew*, 594 F.2d 1103, 1105 (6th Cir. 1979) (affirming admission of hearsay evidence at suppression hearing) (citing *United States v. Lee*, 541 F.2d 1145, 1146 (5th Cir.1976) (reversing exclusion of evidence at suppression hearing when based on grounds that it was hearsay)), *cert. denied*, 442 U.S. 933 (1979), *United States v. Mota*, 155 F. Supp. 3d 461, 468 n.4 (S.D.N.Y. 2016).

Again, the investigators into Mr. Gumbs developed reasonable suspicion to warrant stopping Mr. Greatsinger. Their knowledge was imputed to Officer Riehl who conducted a walled-off stop pursuant to their instructions. With the help of canine Hanny, the officers' suspicions ripened into probable cause and permitted a search of the vehicle. *See Florida v. Harris*, 568 U.S. 237 (2013), *United States v. Bodnar*, 37 F.4th 833, 840 (2d Cir. 2022) (same) *accord United States v. Glover*, 957 F.2d 1004, 1013 (2d Cir. 1992) ("[O]nce the narcotics dog 'hit on' [contraband], the police had probable cause to obtain a search warrant."). Thus, the stop and the search were legally valid.

## **CONCLUSION**

For the foregoing reasons, the motion to suppress (ECF No. 305) is **DENIED.** Mr. Greatsinger is ordered referred to a United States Magistrate Judge for a hearing pursuant to *Missouri v. Frye*, 566 U.S. 134 (2012). The parties are instructed to contact such magistrate judge without delay, given the upcoming trial scheduled in this case.

**IT IS SO ORDERED** at Hartford, Connecticut, this 4th day of November, 2024.

                                            /s/
                                OMAR A. WILLIAMS
                                UNITED STATES DISTRICT JUDGE